a reasonable doubt the force necessary to ensue the greater punishment of aggravated rape.  See *State v. Burnett*, 496 So.2d 1236 (La.App. 5 Cir. 1986); Art. 821(A)-(E); Art. 882(A)(B)(2).

Relator contends there was no proper identification of the defendant to single out as perpetrator of crime in a corporal lineup.  Under the standard of *Neil v. Biggers*, 114 S.Ct. 217 (1993), (1) the victim didn't have opportunity to view the defendant at the time of crime; (2) The witness' degree of attention in relation to the identification; (3) The accuracy of the defendant in relation to the identification; (4) The witness' level of certainty when identifying the defendant at the confrontation; the length of time elapsed between the crime and the identification.

## ERROR 7

State erred when it did not adhere to the high standard of Louisiana Rule of Court; Part G, § 10: District Court Stands: Equality, Fairness, and Integrity: Standard 3.1.  Fair and Reliable Judicial Process: Trial Court procedures faithfully adhere to laws, procedural rules and establish policies; Standard 3.3.  Court Decisions and Actions.  Trial Courts give additional attention to cases, deciding them without undue disparity among like cases and upon legally relevant factors.

Advocate: Rule 3.8; Special Responsibilities of a Prosecutor: Refrain from prosecuting a charge that the prosecutor knows is not supported by probable cause.

Hon. Williams J. Knight, Asst. D.A. went far below high standards set out in Louisiana Rules for Court and Special Responsibilities of a Prosecutor in pursuing prosecution of defendant for R.S. 14:42 aggravated rape instituted illegally by bill of information instead of grand jury indictment, which would not support probable cause.  Art. 382(A): A prosecution for an offense punishable by death, or for an offense by life imprisonment, shall be instituted by indictment by a grand jury.  See C.Cr.P. art. 5; art. 383; art. 384, art. 872(2)(3); a valid sentence must rest upon a valid and sufficient indictment, verdict, judgment, or plea of guilt.  Louisiana Const. Article 1

§ 13, section 13: In a criminal prosecution, an accused shall be informed of the nature and cause of the accusation against him.  Defendant was never indicted by a grand jury therefore defendant has never been informed of the nature and cause of the accusation against him.  The bill of information charging defendant is in violation to C.Cr.P. art. 384, art. 383, art. 382; La. Const. Art. 1 § 13: Bill of Information or indictment must be clearly and concisely stated and must contain all the essential elements of crime intended to be charged in sufficient particularity to enable defendant to prepare for trial, to allow court to determine propriety of the evidence which is submitted upon the trial and to impose the correct punishment on verdict of guilt, and to afford protection from subsequent prosecution for the same offense.  LSA-Const. Art. 1 §§ 9, 10; See **Berger,** supra.  Bill of Information charging that defendant violated statute by committing an aggravated rape was defective in failing to follow short form for charging agg. rape was defective in failing to name victim.  LSA-Const. Art. 1 §§ 9, 10; LSA-R.S. 14:42 & 14:64; LSA-C.Cr.P. art. 465, 473.  See bill of information attached.

District Attorney has entire charge and control of every criminal prosecution instituted or pending in his district, and determines whom, when and how he shall prosecute.  C.Cr.P. 61, 62.  Although District Attorney is invested with such authority he shall not go beyond the law and Const. of the United States and Louisiana to gain a conviction.  C.Cr.P. art. 382-4; C.Cr.P. art. 872; C.Cr.P. art. 442-4; (A) 1-3; (B) Art. 461-6, 8; Art. 473; La. Const. 1 § 13 section 13, § 2, § 3, § 15; Federal Const. Art. 7; Amendment 5, Amendment 6 [1791]; Art. 7, Amendment 8 [1791]; Amendment 13 [1865] section (1); Amendment 14 [1868].

Error patent, LSA-C.Cr.P. 382, subd. A, 533(5), 535, subd. C. **State v. Hansbro,** 796 So.2d 185, 35,027 (La.App. 2 Cir. 9/26/01).  District Attorney are empowered to amend indictment to charge lesser charge.  However, district attorney doesn't have power or authority to upgrade a bill

of information to one requiring a grand jury investigation and indorsement. The State may abandon the charge of a greater crime and proceed with prosecution for the lesser crime, and no formal indictment is necessary for the purpose. Lack of a "true bill" endorsement is an error patent. *State v. Hansbro*, supra. In instituting prosecution by bill of information State violated defendant's right to Due Process and to fair and impartial trial under law and constitution. State knew prosecution of R.S. 14:42 instituted by bill of information is not supported by law and const., therefore is a reversible error. See *State v. Donahue*, 355 So.2d 247.

## ERROR 8

State erred in its' closing argument where Asst. District Attorney knowingly misrepresented, mischaracterized, misquoted, miscited facts and authorities in oral and written communication to the court.

SECTION 1.

In closing argument, State asserted Mrs. Thompson said she, could see very clearly in the light coming through the doorway David L. Williams. The record shows (T.Tr. 55) she was in her bed when her attacker came upon her with the light to the perpetrator's back. See Exhibit D2, initial police report Exhibit E4-A, B, C. Not one time did the victim call out or said defendant's name to police officers which leaves the logical question who did. It appears the victim was speaking to Officer Tanya Bickham, a young black female who had grown up and around in the neighborhood. Relator contends it was not the victim who brought up his name but Officer Bickham. State went on to assert, Mrs. Thompson say, "I told the police who came in on her was David." No such testimony was given by Mrs. Thompson.

Defense brought some vital points to the front to the jury in his closing argument. "The identification of this man, I don't think is very strong." "I'm telling you that under reasonable doubt concepts, no. This man has not been proven guilty beyond a reasonable doubt. I don't think

this man has even been I.D.'ed.  I don't think that at all."  (T.Tr. 168-9).  Mr. Ford was correct, defendant was never properly identified outside of in-court I.D.  There was no corporal lineup on the morning of the attack nor thereafter.  If defense attorney had investigated he would have known for certain that his client was never properly I.D.'ed and could have presented a much more effective defense.  Anyone can come to a courtroom and point a defendant out at the counsel table, the only black man at the table in front of courtroom.  (T.Tr. 51).  Again, referring back to (T.Tr. 55) Mrs. Thompson testified, she was on her bed when her attacker came upon her which is a direct contradiction that she got out of bed went up the hallway and immediately recognized her attacker.  To further stress this contradiction in the victim's testimony at trial, Mrs. Thompson in her statement to police officers Lynn Armand and Connie Tanya Bickham said, "I jumped up in the bed, sat up in the bed to see if I could see anybody or anything he entered the door."  (Exhibit E4-A).  Clearly, Mrs. Thompson is still in her bedroom and in her bed when the attack took place.  The contradiction here is that Mrs. Thompson can't be in two places at one time.  She can't be in her bed when the attack took place.  She can't be in her bed where she was asleep and awaken by noise in her home and just as she attempted to get out of bed her attacker converged upon her suddenly, and at the same time be in the hallway leading to the bathroom and through to the dining room where she sees her attacker coming in the dining room.  It's not humanly possible for anyone to be in two places at one time.  (T.Tr. 55).

Mrs. Thompson further states, "And that's what waked me up, really (referring to the noise she heard) and when I looked up and saw it was a man, I commenced screaming, he rush for me and said hush up, I'll kill you."  (T.Tr. 50-1, 55)(Exhibit E4-A, Exhibit D2).  Her statement here coincide with her testimony that she was in her bedroom in bed when the attacker came upon her and contradicting her statement that she saw the attacker clearly in the hallway.  Mrs. Thompson

further states under cross examination by Mr. Ford, "I recognize him when he was, when he got in the door of the dining room. He had come through the kitchen and the dining room. . . I could see perfectly who it was and other than that, I never would have known." (T.Tr. 60). I ask court to scrutinize Mrs. Thompson's testimony carefully in that all the contradiction show she never saw her attacker's face clear at anytime during the attack on, but her story was concocted by her and Asst. District Attorney to produce a wrongful conviction. See Exhibit D2 drawing house in relation to Mrs. Thompson testimony that she saw her attacker when she stated in (T.Tr. 55) that she was still in the bed. See also initial police report. (Exhibit E4-A thru D).

SECTION 2.

As in *State v. Sullivan*, 596 So.2d 177, 186, relator asserts the prosecutor misstated or didn't give and apply the applicable law and the judge's instruction did not alleviate the problem by providing a clear and unambiguous statement of the law and the jury's responsibilities.

Assist. Prosecutor explains to what aggravated rape is. (T.Tr. 12)(1) Where the victim resisted the act to the utmost but whose resistance was overcome by force, or (2) where the victim is prevented from resisting the act by threat of great and immediate bodily harm accompanied by apparent power of execution or (3) where the victim is prevented from resisting the act because the offender is armed with a dangerous weapon. (T.Tr. 12). What prosecution neglected to inform jury is that to prosecute relator for the crime of R.S. 14:42 required that he be indicted by a grand jury.

SECTION 3.

Prosecutor repeatedly insinuated defendant lied or was lying directly or indirectly before the jury. (T.Tr. 138). As to question #4, T.Tr. 144, defendant never said he couldn't remember what had happened before he went to Covington, La., or after he was awaken when he arrived back

in Franklinton, La., only while he was in Covington, La., his memory isn't clear because of heavy drinking and smoking marijuana. (T.Tr. 159-60).

SECTION 4.

Mr. Knight asserted to the jury, "She (Mrs. Thompson) went to the doctor. She went to see Dr. Wickboldt and Dr. Wickboldt was accepted by this Court as an expert in internal medicine. What did he tell you? That there was a tear in the vaginal opening. He said there was also an abrasion on the cervix deep within the vagina. He said there was also seminal fluid deep within the vaginal opening, which was pooled toward the back of the vagina. All of this is consistent with forcible sexual intercourse." (T.Tr. 155).

However, Dr. Wickboldt actually stated, when asked by Mr. Knight in a hypothetical question about the abrasion on the cervix which he described as, "An abrasion is a superficial tearing of the surface, much like a brush burn." It would be caused by "over-expansion." Dr. Wickboldt testified this was consistent with intercourse, not forced intercourse as prosecutor misquoted and misled jury to believe. (T.Tr. 106-110). Dr. Wickboldt never testified it consisted with Forcible rape as District Attorney asserted before the jury. (T.Tr. 155). It must be noted that the technician Mr. Jerry Miller stated that in a case like this, "It is possible, that there was a mixture of A and O antigens, not that there were. (T.Tr. 124). On further questioning, Mr. Miller stated "that in a case like this, . . . of course, you can only suggest there's going to be a mixture of fluids there, like vaginal secretion and spermatozoa or seminal fluids. . ." Q. "Okay, in this particular case also there is a possibility that some of the antigens can be coming from another Type A secretor. I cannot say for sure." (T.Tr. 128). Q. By Mr. Ford: "Possible, not probable?" A. "Well, I can say in this particular case that whoever left the stain can be a Type O secretor or maybe a Type A secretor also, the same as the victim." (T.Tr. 129).

SECTION 5.

In cross examination of the defendant by Mr. Knight.  "Mr. Williams, you've heard the testimony of the doctor who testified you had seminal fluid in your penis at the time he examined you." (T.Tr. 142).  What Dr. Wickboldt stated was, "I more or less milked the penis in an attempt to obtain some fluid from the urethra.  There was a small amount of fluid obtained.  "There was a little bit of fluid, in milking the penis in an attempt to get anything out of the urethra . . . there was a small amount of fluid at the opening of that urethra." (T.Tr. 108).

> Q.     This was something which would have to be examined microscopically to determine the exact nature of the fluid?
>
> A.     That is correct.  (T.Tr. 109).

It must also be noted that the same doctor stated later, "that such fluid . . . could be in the urethra for prolonged period of time." (T.Tr. 112).

Technician Mr. Miller stated that it take spermatozoa twelve to twenty-four hours to deteriorate.  (T.Tr. 127).  Court should take note it was only 3-4 hours from arrest to examination and the taking of samples.  One might ask how long did it take from the examination to the crime lab, in that case the same can be asked about the victim samples yet spermatozoa was found in her sample and they were submitted at the same time.

Mr. Miller also state, "We did not really have enough on the swab there to really test to (get a type off it)." (T.Tr. 126).  This was in answer to Asst. Prosecutor's question if he was able to make a match from the seminal fluid on the swab from the defendant with seminal fluid found within Mrs. Thompson.

Q.  By Mr. Knight, "Alright, sir, but the fluid obtained from the defendant, David L. Williams, which was contained in the rape kits, was seminal fluid containing spermatozoa, is that correct?

A.  "On that urethra swab we got an (indication) of seminal fluid.  There was no spermatozoa

found." (T.Tr. 126). In essence, Mr. Miller's statement shows there were no physical evidence to link defendant to the rape of the victim.

SECTION 6.

Assistant prosecutor stated to the jury: "She (Mrs. Thompson) remembers that $286.00 . ." (T.Tr. 171). However, the record reflect she never said she remembered the $286.00 as being hers. When asked to identify the money as State's #1 she stated, "Well, I can tell you what was in there. I had $100.00 bills, four $20.00 bills, One $5.00, and on six, one $5.00 bill and one $1.00 bill." (T.Tr. 56). This amounts to $297.00 dollars not $286.00 that she said was hers.

Assist. Prosecutor also tell jury, "She (Mrs. Thompson) also told the police officers, "I had $286.00 and some few cents left over from when I made my groceries from my check," and she was able to identify the amount of money. (T.Tr. 156). What the victim already stated to police officers in initial report that the district attorney withheld from defense is, "I had took a hundred dollars out to pay something and I think I had around three hundred and eighty-three, hundred and eighty dollars or something like that. (Exhibit E4-C). Mrs. Thompson told police officers that her attacker took, "Nearly four hundred dollars in case," from her. Again prosecutor knowingly, misquote and misrepresent victim to gain an illegal sentence and conviction.

SECTION 7.

District Attorney erred when he used tactics of prejudice to gain sympathy for the victim to gain a wrongful conviction in violation of art. 774, art. 770, art. 771, art. 775(3)(5); R.S. 15:452 which state, No person under arrest shall be subjected to any treatment designed by effect on body or mind to compel a confession of crime. C.Cr.P. 5.

Throughout trial, prosecutor argument appealed to passion and prejudice at both phases of the trial. In cross examination prosecutor asserted, "Isn't it true that she's (Mrs. Thompson) been

41

cooking for your family since your mother has been dead and try to help you all out a little bit." (T.Tr. 140). Prosecutor knew his statement not to be true and factual. His statement was wholly for prejudicial purposes and outside evidence and record developed at trial. His state was only to vouch for the credibility of the victim. His statement only served to inject an extraneous issue into the trial. See *Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629. "Prosecutor's duty is not only to use every legitimate means to bring about a just conviction, but to refrain from improper methods calculated to produce a wrongful conviction." *State v. Sullivan*, 596 So.2d 177; 295 U.S. 78, 55 S.Ct. 629.

Prosecutor used sympathetic tactics throughout the whole trial to pull jury's attention away from the true fact that the State did not have evidence to convict defendant of aggravated rape. Prosecutor used terms and phrases such as, ". . . as you will be told when she testifies, is an eighty-two year old lady." (T.Tr. 45). ". . . she was further prevented from resisting because of the great disparity in size between herself and the defendant. You will have an opportunity to see Mrs. Thompson when she take the stand, and you will note she is a slight, elderly lady." (T.Tr. 48). "She simply does not have the physical ability to resist. "The main witness obviously was Mrs. Ethel Thompson. She is an elderly lady. She is eighty-two years old. She is a rather small lady. She is rather crippled with arthritis. She has some trouble getting around." She is a remarkable eighty-two year old lady. She is doing extremely well for her age. You have also seen the defendant. You have seen his physical size. He's a big, burly, robust young man. (T.Tr. 151). "You remember when she was on the stand she said, "Oh no, oh no, no," and he told her to be quiet or he would cut her head off. Now that, ladies and gentlemen, is the voice of somebody when he's that size who means he is going to do what he says he's going to do." (T.Tr. 153). Now place yourself in Mrs. Thompson's shoes for just a moment and look at the size of her and the size of the

defendant and ask yourself if you believe that she believe that the defendant was able to carry out his threats. I am certain you would be under those circumstances. I'm not in Mrs. Thompson's age and condition, and I certainly would believe it. (T.Tr. 154).

SECTION 8.

Prosecutor went so far as to insinuate that defendant should have been mentally and physically tortured to confess to the crime in violation of R.S. 15:452, art. 770-1, 77405(3). No person under arrest shall be subjected to any treatment designed by effect on body or mind to compel a confession of crime.

I submit to you, ladies and gentlemen of the jury, the defendant is having selective memory lapses. He doesn't want to tell you what he remembers about that night. He doesn't want to admit to you what happened that night, but if he is pressed, and we could press hard enough and make him tell the truth, then I believe the truth would be that he went to Mrs. Ethel Thompson's house and raped her that night, but he's not going to remember that. (T.Tr. 159).

Relator contend that judge should declared mistrial even if defense attorney didn't object sympathy plea and prejudicial remarks under art. 771, 770, 774, 775(3), by prosecutor for no other then fairness and justice.

Against prosecutor appealed to jury for sympathy, "I want you to think about what has been said from this stand. I'm going to cut your head off. . . I'm going to rip your guts out." Over and over and over again to an eighty-two year old little lady by a twenty-four year old defendant, who is as big as a barn. What else can an eighty-two year old little lady to do against a big robust man." (T.Tr. 172, 173). The initial police report of the victim shows prosecutor's exaggeration on how many times perpetrator told her he would harm her. (Exhibit E4-A thru E4-D).

43

SECTION 9.

Mr. Knight further engaged in an effort to intimidate defendant while on the witness stand and to bully him before the jury.  Cross examination by Mr. Knight of relator:

Q.  You don't have any explanation for how that money got under your couch where you were sleeping that night, do you? A.  No.  I don't, but who said the money was Mrs. Ethel Thompsons'? The money was taken to her.  Anybody that see they have money missing that come from a person's father, say the money came from my father, and knowing my father, he took it over there and she knowing how I am his son, knowing that somebody had stolen some money from her, she could have just said that was her money, wouldn't necessarily mean that mark was on there could have recognized it.  If you will -- Q.  I will ask question, Mr. Williams.  Thank you.

By Mr. Ford: Your Honor, he's trying to explain his answer right now.

By Mr. Knight: I think he's trying to give a dissertation, your Honor, which I would object to at this point.  I would ask the question --

By the Court: You are instructed to let him answer the question and you are instructed you are not to ask questions, simply to answer the question as presented to you.

By Mr. Knight: Thank you, your Honor.  (T.Tr. 143-4).

Clearly, Asst. Prosecutor didn't want relator to answer a question with a question so he sought to bully and intimidate and embarrass relator before the jury because his case was weak against relator and wasn't built on facts of evidence nor law but on half truths and deception in order to manipulate the jury to gain sympathy for the victim for a wrongful conviction and sentence of life imprisonment of relator.  See *Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629.

Relator contends that prosecutor's misrepresentation of witnesses, misquoting and misciting of facts, and misstatement of the applicable law the judge's instruction did not alleviate

the problem by providing a clear and unambiguous statement of the law and the jury's responsibilities. See *United States v. Bagley*, 105 S.Ct. 3375, 3381. "If the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to creat a reasonable doubt." Id. at 113, 96 S.Ct. at 2402, *Agurs*.

It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecutor attorney, will be faithfully observed. Consequently, improper suggestion, insinuations, and especially assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none. *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633. For this reason, relator's conviction and sentence should be reversed and vacated.

## ERROR 9

STATE ERRED WHEN IT WITHHELD FAVORABLE MATERIAL IN ITS' POSSESSION, EXCULPATORY AND IMPEACHING THE FORM OF INITIAL POLICE REPORT AND SUPPLEMENTARY REPORTS.

Prosecutor knowingly withheld the police report of Mrs. Thompson initial statement to officers which could have been used to impeach state's primary witness Mrs. Thompson in that she testified she saw her attacker clearly, but she identified her attacker to police officers, that she did facilitate and induce the sexual assault upon her by conduct in conversing in improper manner, that the money $286.00 Mrs. Thompson identified as hers may not have been hers because of the actual amount stolen was nearly four hundred dollars and the fact that the victim never gave officer any identifying mark of money if it had been recovered, police report shows there is a time variance that defense could have used, police report show the victim wsa never struck at any time and there was no resistance on the part of the victim to resist the act of intercourse. (Exhibit E4-A thru D).

Prosecutor withheld crime laboratory report that shows a comb was taken from the crime scene left by the perpetrator which would have presented fingerprints and hair sample. (Exhibit B).

Prosecutor withheld supplementary report from defense if defense had retained as it had asked for, it could have shown no money was never identified to police officers, the configuration of the house that contradict victim story she saw attacker. See (T.Tr. 55). Document also shows victim took a bath before calling police. One would have to think what effect her bathing had on the evidence. Exhibit D2.

Prosecutor withheld supplementary report #3 which shows Officer Lynn Armand was left at crime scene to life fingerprints and take photographs which was not introduced into evidence at trial.

Relator contends prosecutor knowingly withheld from court and defense that State was going to use Officer Connie Bickham as witness at trial in order that she would not be asked certain questions which would have revealed that she was actual source of identifying relator as perpetrator of crime against victim. See Witness List (Exhibit E4-G). Prosecutor used trial by ambush or prosecution by ambush by not placing Officer Bickham on witness list when State intended to use her the whole time. See Exhibit E4-H thru J; Exhibit E4-K emergency record; Exhibit E4-K2 radio log; Exhibit E4-A thru E4-D) which shows Officer Bickham one of the officers taking the victim statement, and the other Officer Patrolman Lynn Armand who was not on the witness list. However, should have been because Officer Armand took initial statement made by the prosecutor and Mrs. Thompson. If this evidence had been given to defense and introduced at trial defense could have caused considerable doubt on State's case against relator as

46

perpetrator of crime aggravated rape and invariably would have resulted in a not guilty verdict of relator's innocence.

Although Officer Bickham had definite role in the investigation of the assault on the victim, her courtroom testimony was restricted to her only transporting the rape kit of the victim from the hospital to Officer Harold Varnado.  (T.Tr. 78-9).  Officer Bickham's testimony is somewhat different from other officer's testimonies in that the prosecutor didn't ask certain questions of tampering with the evidence although she had handled it.  For instance, when Officer Varnado testified prosecutor asked, "During the time it was in your possession did you alter or change it in any way?  (T.Tr. 81).  Q.  "Now at any time while State's #5 was in your possession did you change or alter it in any way?  (T.Tr. 82).  Q.  During the time it was in possession, was it altered or changed in any way?  (T.Tr. 85).  Officer Denver Miller is now asked the same line of questioning: "Was it changed or altered by you in any way during the period of time you had it in your possession?"  (T.Tr. 87).  CHIEF WADE BATEMAN is asked the same as to evidence, "Alright, sir, State's #3 and State's #4, have they been changed or altered at any time during the period of time they were in your possession?"  (T.Tr. 89).  Q.  "Has it been changed or altered in any way at any time during the period you had it in your custody?"  Q.  "Has it been changed or altered by you in any way since you received it back from the crime lab?"  (T.Tr. 90).  Q.  "Was it changed or altered in any way while it was in your custody?"  (T.Tr. 91).  Officer Bickham was not asked any of these questions of changing or altering the evidence.

Officer Miller testifies no one else had access to the car where he had placed evidence. However, relator contends others did have access to evidence one being Officer Bickham who was there at that time and had means and motive for tamper evidence, because Mrs. Thompson was relative of hers.  Officer David McNish he took Mrs. Thompson to hospital and said that he was

the only officer there.  (T.Tr. 100).  However, hospital emergency room record show Officer Bickham was there as well.  (Exhibit E4-K).  Relator contends the only tangible evidence prosecutor had to implicate him in crime was the A antigen on his underwear which was weak evidence at best and was placed there by officer or officers to further implicate as perpetrator. Relator asserts that the evidence was tampered with although he cannot prove it by the record.

Prosecutor withheld D.A.'s file from defendant until well past the three year deadline for PCR and trial transcripts as well as the knowledge of being illegally prosecuted by the State by Bill of Information.  Exhibit A and C.  Relator had asked for trial records as early as December 15, 1983.  Relator did not receive any court document from the 22nd Judicial District until January 29, 1999, Bill of Information; Exhibit-C; July 8, 2002, D.A.'s file.  Relator contends it took him (3) years to save enough money at $0.02 an hour to be able to buy court transcripts from Louisiana Supreme Court.  See Exhibit F; F-1; F-2 A thru F-2-D.  This willful misconduct on the State's behalf hampered defendant's effort to a great degree in his quest for justice and fairness in the Judicial process of law.

District Attorney denied relator equal access to evidence to conduct independent study and testing of all evidence introduced in the trial.  See Motion for Pre-trial discovery.

Relator contends that district attorney's file and its' contents are newly discovered evidence presented to him July 8, 2002.  Relator filed a PCR writ June 13, 2003, seeking relief.  However, he was denied by the District Court and later the Lousiana Supreme Court, January 28, 2005, in part.

Allegation that State suppressed material exculpatory evidence at trial in violation of Brady and that defendant and his attorney did not know of claim until defendant obtained documents pursuant to Public Records Act raised claim falling under statute providing exception to 3 yr. time

limit for filing for post conviction relief.  LSA-C.Cr.P. art. 930.8, subd. A(1); LSA-R.S. 44:1 et seq.; *Winn v. Louisiana*, 685 So.2d 104.

Withholding of exculpatory evidence under certain circumstances may constitute event "under control of the State" for purpose of statute providing exception to 3 year time limit for filing application for post conviction relief. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

*In re Thompson, Keith,* plaintiff(s): applying for supervisory and/or remedial writ; 480 Parish of Orleans, Crim. District Court, Div. E, No. 304-916 to the Court of Appeal, Fourth Circuit, No. 92-KW-2278.  Writ granted, case remanded.  Relator in the instant application alleges on the basis of a police report obtained after his conviction that the State suppressed material exculpatory evidence at trial and that his present constitution claims therefore rest on facts not known to him or his attorney as set out in La.C.Cr.P. art. 930.8(A)(1), which provides an exception to the 3 year time limit filing application for PCR.  Accordingly, the judgment of the 4th Circuit is vacated and this case is remanded to the Court of Appeal for reconsideration of the District Court's ruling that relator's application was otherwise barred by the repetitive application provisions of La.C.Cr.P. art. 930.4. *State ex rel., Thompson v. State of Louisiana*, 661 So.2d 479, 94,0480 (La. 10/13/95); *State ex rel. Gregory Cormier v. State of Louisiana*, 731 So.2d 274, 1998-2111 (La. 10/13/95); La. Const. Art. 1 § 16.

Relator asserts that the State withheld initial police report, supplementary reports to conceal truth from defendant, his lawyer, and Court and jury that he and victim conspired together obtain a wrongful conviction.

Relator asserts that the State withheld information from defendant, his attorney, Court and jury in the initial police report.  First, that Officer Bickham was the radio dispatch officer on duty

the morning of crime.  See Exhibit E4-K2.  Second, that Officer Bickham was one of the officers along with Officer Armand who took victim's official statement.  Exhibit E4-A thru E4-D.

Relator asserts that the State withheld the Emergency Room Record from defense, show officer Bickham was also at the hospital same time Officer McNish testified he was the only officer at hospital with victim.  Exhibit E4-K, T.Tr. 100.

Relator asserts that prosecutor intentionally misled defense and court by keeping officer Bickham's name off the witness list when it had full intention to put her on the stand as witness to avoid more serious questioning.  Exhibit E4-G, Exhibit E4-H, I, J.

Relator asserts that prosecutor withheld initial police report from defense showing officer Armand was one of the officers taking official statement from the victim and was not placed on witness list as material witness to avoid more serious questioning and fact finding.  Exhibit E4-A thru E4-D.

Relator contends that the prosecutor adversely affected the adversarial process of the trial in denying defense the records that had been requested from the start of trial.  Therefore, making defense counsel ineffective throughout trial and denying relator a fair and impartial trial.

In a long line of cases that include *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932); *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), this Court has recognized that the Sixth Amendment right to counsel exists, and is needed, in order to protect the fundamental right to a fair trial.  The Constitutional guarantees a fair trial through the Due Process Clause, but it defines the basic elements of the Sixth Amendment, including the counsel clause: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and District wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause

of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense." Thus, a fair trial is one in which evidence subject to a adversarial testing is presented to an impartial tribunal for resolution of issues defined in advance of the proceeding. The right to counsel plays a crucial role in the adversarial system embodied in the Sixth Amendment, since access to counsel's skill and knowledge is necessary to accord defendant the "ample opportunity to meet the case of the prosecution" to which they are entitled. *Adams v. United States ex rel. McCann*, 317 U.S. 269, 63 S.Ct. 236, 87 L.Ed. 268 (1942).

Because of the vital importance of counsel's assistance, this Court has held that, with certain exceptions, a person accused of a federal or state crime has the right to have counsel appointed if retained counsel cannot be obtained. See *Argersinger v. Hamlin*, 407 U.S. 25. That a person who happens to be a lawyer is present at trial alongside the accused, however, is not enough to satisfy the constitutional command. The 6th Amendment recognizes the right to the assistance of counsel because it envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results. An accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair. *Strickland*, supra.

In cases in which the government acted in a way that prevented defense counsel from functioning effectively, we have refused to require the defendant, in order to obtain a new trial, to demonstrate that he was injured. *Strickland*, supra. Due process clause requires State to provide to defense any information which is in State's possession, if favorable to accused, and is material to guilt, including impeachment information. U.S.C.A. Const. Amends. 5, 14.

51

The State is required to provide to the defense and information in its possession which is favorable to the accused and is material to guilt. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). This, of course, includes exculpatory and impeachment information and the "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *U.S. v. Bagley*, 473 U.S. 667.

Relator contends that prosecutor refusal to hand over *Brady* material and notify defense of Officer Bickham as a witness for the State and the absence of Officer Armand was a violation of the confrontation clause set out in *Davis v. Alaska*, 415 U.S. 308. Also by withholding police report and supplementary report State prevented defense from making adequate inquiry into the fact of the case prosecutor presented against him.

Constitutional right of accused to be confronted with witnesses against him means more than being allowed to confront witnesses physically and a primary interest secured by it is the light of cross-examination. U.S.C.A. const. Amend. 6.

> ". . . cross-examination is not only permitted to delve into witness' story to test witness' perceptions and memory but is traditionally allowed to impeach, that is, discredit the witness. Partiality of witness is subject to exploration at trial and is always relevant as discrediting witness and affecting weight of his testimony. Denial of right of effective cross-examination was constitutional error of the first magnitude so that no amount of showing of want of prejudice could cure it." U.S.C.A. const. Amend. 6.

Relator contends had it not been for prosecutor withholding police report and supplementary police report relator's constitutional right to confront witnesses present and absent would not have breached and he would have been able to show main witness was unbelievable in instant case.

Relator who was prosecuted for aggravate rape, was denied his constitutional right of confrontation of witnesses in state trial where he was precluded by State prosecutor's withholding *Brady* material from cross examining key prosecution witnesses, Mrs. Ethel Thompson, Officers Bickham and Armand to show that main witness was not telling the truth about incident in the case against relator. Moreover, police report show where victim stated that $286.00 was hers, the report states it was $383.00 or nearly four hundred dollars was stolen. Where victim states she recognized her attacker, and told officers his name, the report clearly show she never got a good look at the perpetrator and never called Relator's name. Where victim stated she resisted the attacker, record reflect she did not resist and in fact induced and facilitated the assault through her conversation. Defendant and jurors were entitled to all material evidence presented to them. First, that defense would to affect adversarial process of trial in fact finding and that the end result would have ended in a fair trial through due process. Second, that jury would have all evidence before them in order to render a reliable and valid verdict.

Relator contend that serious damage to the strength of the State's case would have been a real possibility had defendant been allowed to have *Brady* material and to pursue a line of argument and of inquiry based on the information of those documents.

The 6th Amendment to the Constitution guarantees the right of an accused in a criminal prosecution "to be confronted with witnesses against him." This right is secured for defendants in State as well as federal criminal proceedings under *Pointer v. Texas*, 380 U.S. 400 (1965). Confrontation means more than being allowed to confront the witness physically. 'Our cases construing the (confrontation) clause hold that primary interest secured by it is the right of cross examination.' *Douglas v. Alabama*, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965).

53

In *United States v. Valenzuela-Bernal*, 458 U.S. 858, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982), the Court held that due process is violated when the testimony is made unavailable to the defense by Government deportation of witnesses "only if there is a reasonable likelihood that the testimony could have affected the judgment of the trier of fact." Whenever the government fails, in response to a request, to disclose impeachment evidence relating to the credibility of its key witnesses, the truthfinding process of trial is necessarily thrown askew. The failure to disclose evidence affecting the overall credibility of witnesses corrupts the process to some degree in all instances. See *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

(Marshall, J., dissenting), but when "the reliability of a given witness may well be determinative of guilt or innocence.' *Giglio*, supra. Without Mrs. Thompson's testimony there could have been no case, there was no indictment against relator, and no evidence to carry the case to the jury. Mrs. Thompson's credibility as a witness was therefore an important issue in the case, and evidence perjury, contradiction and inconsistency would be relevant to her credibility and the jury was entitled to know of it. What has happened to relator amount to nothing more than false imprisonment by the State. La.C.Cr.P. art. 465.

Relator contends that because he was denied *Brady* material relevant to his innocence, he was also denied access to court by State in refusing him adequate remedy by due process of law and justice, administered without denial, partiality, or unreasonable delay, for injury to him in his person, property, reputation, or other rights. See *Barefoot v. Texas*, 463 U.S. 880, 103 S.Ct. 3383. Since the truth-seeking process has been unfairly skewed a new trial is warranted. See State v. Bright. Nevertheless, it is important to note that *Brady* and its progeny do not establish a general rule of discoverability, and not every case in which it is discovered post-trial that favorable evidence was withheld by the State will result in a reversal of the condition. "A prosecutor does

not breach any constitutional duty to disclose favorable evidence unless the omission is of sufficient significance to result in the denial of the defendant's right to a fair trial." *U.S. v. Agurs*, supra. For purpose of *Brady's* due process rule, a reviewing court determining materiality must ascertain not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. *Kyles v. Whitley*, 514 U.S. 419 (1995). Thus, the reviewing court does not put the withheld evidence to an outcome-determinative test in which it weighs the probabilities that the petitioner would have obtained an acquittal at trial or might do so at a second trial. Instead, a *Brady* violation occurs when the "evidentiary suppression undermines confidence in the outcome of the trial." *Kyles*, supra.

In the District Attorney's procedural objection to petitioner's post conviction relief, Dale E. Branch and court denied relator's writ on grounds of Art. 930.8. August 5, 1999, based on newly discovered evidence, and before that a post conviction relief claiming, evidence was insufficient to withstand the verdict of guilty, and another PCR claiming ineffectiveness of counsel. And each time petitioner was denied relief. District Attorney in stating (In *State ex rel., Glover v. State*, 660 So.2d 1189 (La. 1995). La. Supreme Court held that: "1. Article 930.8 which limits the filing period for most applications for post conviction relief to three years, and allowing petitioners whose applications would have been barred on effective date of rule one year to file, did not violate federal or State due process clause, habeas corpus clauses, or ex post facto clauses, or the State Constitution clause guaranteeing right of access to courts.

2. The statutory requirement that the trial judge inform the defendant of the limitation period for post conviction relief is supplicatory language and does not bestow an enforceable right upon an individual defendant.

3. Even if the trial court reached the merits in an untimely filed application for post conviction relief, this did not preclude the Court of Appeal from invalidating application on the basis of a time bar.

In effect, the Supreme Court has held that the time bar contained in Article 930.8 is absolute unless the defendant can substantially allege that one of the exceptions applies. None of the exceptions apply in this case.

District Attoreny erroneously assumed Relator could not apply for post conviction relief. First, C.Cr.P. art. 930.8 was enacted well after relator's conviction.  Second, Art. 930.3(A)(B) preclude Art. 930.8 because the conviction was obtained in violation of the Constitution of the United States and the State of Louisiana and the court exceeded its jurisdiction in violation of C.Cr.P. Art. 765(2).

Allegation that State suppressed material exculpatory evidence at trial in violation of Brady and that defendant and his attorney did not know of claim until defendant obtained documents pursuant to Public Record Act raised claim falling under statute providing exception to 3 year time limit for filing application for post conviction relief.  LSA-C.Cr.P. art. 930.8, subd. A(1); LSA-R.S. 44:1 et seq.

Withholding of exculpatory evidence under certain circumstances may constitute event "under control of the state" for purpose of statute providing exception to 3 year time limit for filing application for post conviction relief.  LSA-C.Cr.P. 930.8; *State ex rel. David A. Winn v. State*, 685 So.2d 104, 95-0898 (La. 10/2/96).

In his conclusion, district attorney asserted "In enacting C.Cr.P. art. 930.4, the legislature has given its clear intention that it wants to establish a point in time when a defendant's conviction becomes final.

Relator contends how can there be finality in this instant case, when there's been gross misuse of the law and his individual right as a citizen of the United States and of the State of Louisiana. Relator has from the very start of case against him, has protested the charge against him were and is illegal because legal representative and officers of the court did not follow the rules and laws of federal and state guidelines and the constitutional right to a fair trial and the constitutional right to due process.

For the facts and reasons relator contends his sentence and conviction should be reversed and vacated.

The knowledge of this evidence raises a very important question as to whether or not Relator was convicted for someone else's crime.

Under Louisiana Law, when a petitioner alleges Newly Discovered Evidence, the following requisites must be met: (1) the evidence must have been discovered since the trial; (2) the failure to learn of the evidence at the time of trial was not due to defendant's lack of diligence; (3) the evidence must be material to the issue at trial, and (4) the evidence must be of such a nature that it would probably produce an acquittal in the event of a re-trial. La.C.Cr.P. art. 851. Also, under Louisiana law, it is clear that the new evidence must be so material that it ought to produce a verdict different from that rendered at trial. *State v. Clayton*, 427 So.2d 827 (La. 1982). For purpose of *Brady's* due process rule, a reviewing court determining materiality must ascertain: not whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. [Emphasis supplied]. *Strickland*, supra.

First of all, as stated earlier, Relator discovered this evidence on July 8, 2002, after obtaining his D.A. files. See Exhibit-A, a letter from the D.A.'s office. Relator's trial was held

on March 15-16, 1982. Therefore, it is clear and evident that this evidence was discovered since trial.

Second, the failure to learn of the evidence at the time of trial was not due to the defendant's lack of diligence. Relator's first attorney, Mr. Reggis Simmons pre-trial motions entitled, "Motion for Bill of Particular" and "Motion for Discovery", on February 17, 1982, in which counsel specifically requested to know and be provided with any favorable or exculpatory evidence "*Brady*" material. Furthermore, the district court judge ordered the district attorney to furnish the defendant the particular requested material.

There can be no doubt as to whether or not there was a lacking on the behalf of the defendant to learn of this evidence. As can be seen, Relator's attorney made an attempt to obtain this evidence, countless motions to obtain the exact information over the years. See attached documents from as early as December 15, 1983 thru to July 8, 2002. However, Relator had to wait until three (3) years and some months after 3 year time limit to pay for his own trial transcripts at an hourly wage of $0.02 an hour.

Third, the evidence in question is material to the issues at trial, simply because it was relator's theory of defense that he did not commit the crimes charged against him, someone else did. Had the haircomb been disclosed to the defense, Relator's attorney could have had scientific tests conducted on the haircomb to determine if any hair fibers were left in or on the comb, and these hair fibers could have been tested to show that they belonged to someone else. Also, the haircomb could have been used at trial to show that someone other than Relator had actually left the haircomb during the commission of the crime. Most importantly, is the police report and the supplementary reports which could have been used to impeach the State's star witness, the victim, to show she never saw the perpetrator clearly enough to give or make an positive identification,

58

that she never identified Relator to police officers by name or otherwise as her attacker and that by her conduct she may have induced and facilitated the sexual assault against her.  Moreover, Relator could have used police report to show victim never identified any money to officers and the amount she claimed was stolen was far more than what she claimed at the trial.  Defense and jury had right to know Officer Connie Tonya Bickham was one of two officers who took the victim's statement of the crime, the Officer Lynn Armands.  Prosecutor used a deceptive poise by keeping Officer Bickham's name from appearing on the witness list.  However, bring to trial and have her testify to relatively minor issue but had it been known to defense her true involvement in the entire case could have brought out the truth about who really brought up Relator's name and other important issues of the case and the same is true of Officer Lynn Armands.

It is to be determined that this is a rape case, and evidence of this nature is very valuable to the defense in preparing and presenting its case, which it was denied by the State.  The State prevented the defense from exculpatory and impeaching evidence to the jury in its behalf which jury had a right to hear and examine to conclude a fair and just verdict and sentence.  By all means, the undisclosed evidence was materially relevant.

Fourth, the new evidence is of such a nature that it would probably produce an acquittal in the event of a re-trial.  If this new evidence was presented to a new jury, there is a strong probability that an acquittal would result simply because the defendant would have strong and sufficient evidence to support his defense and undermine the State's case, by presenting evidence that the haircomb was left by the perpetrator other than him and police report and its supplementary reports to show that State case centered mainly around the testimony of an 82 year old woman who had perjured herself on the witness stand.  There is every reason to believe had the haircomb been disclosed and along with police reports to the defense, and had the defense

conducted tests on the haircomb for hair fiber and fingerprints, there is a strong possibility that the test results would have shown that the haircomb and fingerprints belonged to someone else other than Relator, meaning the wrong person has been convicted and detained for over twenty-three years.

It is submitted that Relator has made a clear showing that the Newly Discovered Evidence would produce a different result or an acquittal in the event of a re-trial, and Relator feels as though he should be granted a new trial in the Interest of Justice. In *State v. Perron*, 660 so.2d 903 (La.App. 4 Cir. 1995), the court held that defendant's claim that Newly Discovered Evidence would change the verdict should be considered as a Motion for New Trial. La.C.Cr.P. art. 851(3)(4) Grounds for New Trial:

> The Court on motion of the defendant, shall grant a new trial whenever:
>
> (3) New and material evidence that notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict of judgment of guilt.
>
> (4) The defendant has discovered, since the verdict or judgment of guilt, a prejudicial error or defect in the proceedings that, notwithstanding the exercise of reasonable diligence by the defendant was not discovered before the verdict or judgment.

In further support that Relator was denied his constitutional right, Relator relies on the fact that when a request, whether general or specific in nature is made, the State/prosecution has an obligation to disclose such information under *Brady v. Maryland*, supra.

The duty to disclose evidence is a continuing one. La.C.Cr.P. art. 729.3. It is clear from the record that the State did not adhere to its study.

> "If it can be shown that the State, after request for evidence material to issue and favorable to the defense, has deliberately withheld from

> the trial specific evidence favorable to the defense, error would
> warrant reversal of conviction." *State v. Hodges*, 526 So.2d 406
> (La.App. 4 Cir. 1988).

Certainly, this information if it had been disclosed, would have been beneficial to the defendant,

simply because the evidence was material to his guilt or innocence. *United States v. Bagley*, 473

U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *Kyles v. Whitley*, _____ U.S. _____, 115 S.Ct.

1555, 131 L.Ed.2d 490 (1995).

Had the police report and its supplements been disclosed, defense could have proven main

witness the victim committed perjury. Had defense not been deceived by State concerning all the

witnesses their probative value defense could prove main witness had perjured herself.

Had the haircomb been disclosed to defense, petitioner's attorney could have been scientific

tests conducted on the haircomb to determine if any hair fibers were left in or on the comb, and

these hair fibers could have been tested to show the jury that they belonged to someone else and

comb could have been dusted for fingerprints to show that someone other than Relator committed

the crime. It is to be remembered that this is a rape case, and evidence of this nature is very

valuable to the defense in preparing and presenting its case. The Newly Discovered Evidence had

it been presented at trial, it would have created a reasonable doubt had it been presented at trial,

it would have created a reasonable doubt in favor of the defense, and the outcome of the trial would

have been different.

Non-disclosure of this evidence prior to trial had a cumulative effect on the defense trial

preparations and this information should have been disclosed. *Sellers v. Estelle*, 651 F.2d 1074

(5th Cir. 1981); *United States v. Auten*, 632 F.2d 478 (5th Cir. 1980); *State v. Knapper*, 579 So.2d

956 (La. 1991); *Napue v. Illinois*, 79 S.Ct. 1173 (1959).

Relator in closing, also avers that if DNA testing had been done on comb and other scientific, and fingerprinting, alone with the police report and its supplemental reports the outcome of the trial would have been totally different.

For reason and argument stated above, Relator should be granted a new trial and/or an evidentiary hearing contradictorily with the district attorney should be granted.  Relator also request that all pertinent records/documents be subpoenaed to settle the allegation raised in this matter.

Having met all of the requirements of Article 926.1, and the requirement for Newly Discovered Evidence, David Lee Williams respectfully request that his sentence and conviction be reversed and vacated and a new trial ordered.

## ASSIGNMENT OF ERROR 10
## INEFFECTIVE ASSISTANCE OF COUNSEL

Relator asserts his attorneys Thomas Ford and Sam Collectt was fatally ineffective during trial and sentencing.  And S. Austin McElroy and David J. Knight were ineffective during Relator's direct appeal.

**CONTENTION:**

Relator contend that he was denied effective assistance of counsel when counsel failed to object to bill of information in open court as means of instituting prosecution of R.S. 14:42 Aggravated rape, when he did not object to money being offered as evidence in a rape trial which only probative value was to prejudice against defendant, when he did not object to Relator underwear being entered as evidence when underwear was seized illegally under defective and illegal search warrant, when he did not object to judge's erroneous instructions to the jury, when he did not file any motion in behalf of Relator.

62

Relator contends counsels were ineffective on Direct Appeal when they failed to file list of errors of assignment of the record and trial attorney fatal errors of defense.

Relator contends that his trial counsel was actually ineffective and adversarially ineffective partially due to State withholding *Brady* material sought before trial.

Relator contend trial counsel was ineffective when he did not object to prosecutor bullying Relator on the witness stand, and did not object to prosecutor's prejudicial remarks and a indirect plea of sympathy for the victim to the jury and going outside of rebuttal rules.

**PRINCIPLE OF LAWS:**

In order for the defendant to properly preserve his objection to the "relevant evidence", C.E. art. 105; 401; 403-4, Bill of Information, underwear seized illegally, prejudicial remarks, Trial Court's general charge to the jury, he must comply with the contemporaneous objection rule. An objection to the general jury charge is timely if made immediately after the jury is retired, and objection must be made of evidence when questionable evidence entered as evidence by State at that moment. *State v. Edwards*, 420 So.2d 663; *State v. Prieur*, 277 So.2d 126 (La. 1973); *State v. Mack*, 403 So.2d 8 (1981). In the instant case, defense counsel did not object to bill of information being read in open court, did not object to money and underwear being entered as evidence, did not object to the in-court identification, did not object to the trial court's instruction to the jury which fail to mention the essential elements of the crime, did not object to prosecutor's bullying of defendant on witness stand, did not object to prosecutor's prejudicial remark and remark made to jury outside of scope of facts and evidence of the trial.

**ARGUMENT:**

The right to counsel is a fundamental right of criminal defendant; it assures the fairness, and legitimacy, of our adversary process. E.g., *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792,

9 L.Ed.2d 799 (1963).   The essence of an ineffective assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect.   See *Strickland v. Washington*, 466 U.S. at 686, 104 S.Ct. at 2064; *U.S. v. Cronic*, 466 U.S. 648, 104 S.Ct. at 2039, 80 L.Ed.2d 657 (1984).

To establish the claim of ineffective assistance of counsel, a defendant must demonstrate that his defense attorney failed to meet the level of competency normally demanded of attorneys in criminal cases. *State v. Fickes*, 497 So.2d 392 (1986).   The right of effective assistance of counsel does not require errorless counsel or counsel which maybe judge ineffective only on hindsight.   Upon reviewing a claim of ineffective assistance, a court should inquire whether counsel violated some duty to the client and if so, determine whether the evidence was prejudiced by the violation. *State v. Hartman*, 479 So.2d 948 (1985); *State v. Berry*, 430 So.2d 1005 (1985).   Here, counsel failed to object to the trial court's failure to instruct the jury on the essential elements of the crime. *State v. Simms*, 465 So.2d 769 (1985).

**HISTORY AND FACTS OF CASE**:

Relator was appointed as counsel Mr. Reggie Simmons for representation against the charges of R.S. 14:42 aggravated rape and R.S. 14:64 armed robbery.   Counsel filed all necessary documents for a fair trial as trial minutes will show that trial judge abused its discretionary authority when he denied Motion to Quash bill of information and to examine State's evidence to show there was no grounds to which State could prosecute for aggravate rape and armed robbery. See trial minutes, chronological index, motion for pre-trial discovery, alternatively, prayer for oyer and answer which was filed twice on two separate occasions because of failure of the State to respond to the first request specifically for all recorded testimony before the Grand Jury.   Of

course there was not a grand jury in this case when there clearly should have been an indictment by grand jury.

After preliminary hearing and denial of Motion to Quash and inspection of State evidence, Relator's counsel Reggie Simmons was removed from the case by the Court without notice for one reason only because he had laid the foundation work for a fair trial and he was prepared to fight for his client's right to a fair trial and due process of the law. The record reflect Judge James R. Stain, Jr., presided during arraignment, Bill of Information read in open court, January 28, 1982.

The record reflect Judge Thomas W. Tanner presided during preliminary examination, Motion to Quash bill of information was denied February 25, 1982.

Relator contends from February 25, 1982 until March 14, 1982, he did not know Mr. Reggie Simmons had been removed from representing him.

On the late evening hours of March 14, 1982, just hours from appearing before Judge Hillary J. Crain, for the charges of Aggravated rape, Mr. Thomas Ford and Mr. Same Collett came to the parish jail and informed Relator they were now representing him and they were familiar with the case and prepared to go to trial. Relator had no choice but to put his full trust in the attorneys since he was indigent.

It is at this point relator claim ineffective assistance of counsel; and dereliction of jury by Public Defendant Attorneys' Thomas Ford, Sam Collett and Public Defendant Attorneys' on direct appeal S. Austin McElroy, and David J. Knight.

Louisiana Rules for Court, State 2000

**Article XVI, Rules of Professional Conduct**:
**Client-lawyer Relationship**:

**Rule 1.1(A) Competence**:

A lawyer shall provide competent representation to a client.  Competent representation require the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.

Trial and Sentencing

Attorneys Thomas Ford and Sam Collett March 15, 1982 at this time, on motion of Mr. Knight, Asst. D.A., court severs the charges Count II, R.S. 14:64 Armed robbery and proceeded with the trial on Count 1, R.S. 14:42 Aggravated rape.  Lead attorney Mr. Ford and/or Mr. Collett should have raised objections to state's amendment on the ground the State had no authority to amend a charge of greater punishment.  *State v. Hansbro*, 796 So.2d 185, 35,027 (La.App. 2 Cir. 9/26/01), which states in pertinent part: "District attorneys are empowered to amend indictments to charge lesser offense.  The State may abandon the charge of a greater crime and proceed with prosecution for the lesser crime, and no formal indictment is necessary for the purpose."

Relator contend there is no law that gives District Attorneys the authority to prosecute a charge which require a grand jury to institute which prosecutor did in this instant case in violation of La. Const. Art. 1 § 2-3; § 15-16, § 19-20, §22; United States Const. Article V - VII, Amendment XIII-Xiv; LSA-Crim. P. Art. 382; Art. 5, Art. 383, Art. 462.  *State v. Donahue*, 355 So.2d 247; *State v. Demolle*, 621 So.2d 167.

Relator contends that counsels Thomas Ford and Sam Collett were actual ineffective they knew their client was never indicted by a grand jury.  See T.Tr. 1.  However, a Motion to Quash Bill of Information had already been filed with the court by prior counsel Reggie Simmons earlier February 25, 1982.  Mr. Ford and Mr. Collett should have known there was such a document in

66

existence and acted upon it.  If counsels were unsure of any pretrial motion they should have at start filed for a continuance that they may have time to prepare a defense and file what motion necessary.

Mr. Ford and Mr. Collett created a conflict of interest in the welfare of their client by not exposing the erroneous charge of aggravated rape instituted by bill of information.  Thereby contributing to the prejudice suffered during trial and ultimately being found guilty of charge and sentenced to life imprisonment.  This was a direct violation of procedure and Mr. Ford and Mr. Collett did know that court proceedings were in jurisdictional error of prosecuting their client of R.S. 14:42 under Bill of Information instead of being instituted by grand jury indictment.  Because of this neglect, there was significant prejudice against Relator for lack of counsel's unprofessionalism, lack of knowledge, skill, thoroughness, and preparation reasonably necessary for the representation of Relator David L. Williams.

Defendant's counsels erred when they failed to object to State presenting money and court allowing money entered as evidence against his client.  Such evidence was not turned over to proper authority immediately after discovery.

Relator contends that State using money as evidence in the Aggravated rape trial was inadmissible as evidence when relator was never tried and convicted of robbery.  Therefore, State was not at liberty to say relator had stolen anything from Mrs. Thompson without a conviction of proof.

Relator contends using the money as evidence had no probative value in the case but to prejudice jury against the defendant. *State v. Prieur*, supra, states admissibility of other acts of misconduct involves substantial risk of grave prejudice to a defendant; the probative value of evidence upon related offense in relation to the charge offense should therefore be weighed in light

67

of its possible prejudicial effect, its tendency to influence the triers of fact improperly as to present guilt of accused.  LSA-R.S. 15:445-6.

Evidence of crimes related to the offense with which a defendant is charged is inadmissible except under special exception.  LSA-R.S. 15:445-6; *State v. Prieur*, supra.  In order for the seizure of a thing to be upheld as constitutional, there must be a showing of probative cause that the things seized is somehow related to a particular crime.  U.S.C.A. Const. Amend. 4.

In order for the evidence to be admitted, the State need to show that the evidence is, more likely than not, related to the case.  *State v. Drew*, 360 So.2d 500, 518-19 (La. 1978).  See *State v. Nuccio*, 454 So.2d 93.

The only reason that the money was introduced as evidence was to perpetuate the State's case in the minds of jurors of unproven accusation of theft in an aggravated rape charge against relator.  Further, the money was not relevant to the State's case to prove Aggravated rape.  However, it was used to sway the jury minds from the fact that State had no real evidence to prosecute relator for aggravated rape.  Therefore, leading to an invalid conviction and verdict.  See *State v. Easter*, 756 So.2d 703, 32,940 (La.App. 2 Cir. 4/7/00), in pertinent part, La.C.E. art. 404 which provides that relevant evidence may be excluded if its probative value is substantially outweighed by the danger or unfair prejudice, confusion of the issues or misleading the jury.  Louisiana C.E. art. 401 which provides: "relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

It must be noted that victim could not and did not identify any money until after she had gotten it in her possession.

Relator contends counsel was adversarially ineffective in part due to State withholding police report and affidavit of statement of victim.

Documents obtained in the D.A.'s files secured July 8, 2002 Assistant District Attorney, Mr. Dale E. Branch, (Exhibit E4-A thru E4-D), clearly testifies to her statement to police officers on the night she was assaulted or soon afterward to her contradictory testimony three months later to the court and jury. She said on Page 3, Exhibit E4-C, there was $383.00 taken from her and again on Page 4 Exhibit E4-D the victim said it was "Nearly four-hundred dollars" in cash. However, she never said to police officers that money could be identified by a "X" or "RED" writing on such and such bill nor did she say the money could be identified period. It wasn't until she had gotten the money in her possession and had it for an hour or so that she said she knew the money was hers. Of course she can identify any money at that point after having it and studying it for awhile. Especially when she knew Relator was arrested for the crime against her and if she reasonably believe Relator was the one who raped and stole her money this would be a chance to get some of it back. See Exhibit D5. One must reason on this fact, the victim said in police affidavit nearly four hundred dollars or $383.00 stolen from her then her trial testimony it was $286.00 brought to her that she said was hers, the question is what happened to the remaining $97.00. There was nowhere to spend money in Franklinton, La., at 3 and 4 o'clock in the morning. Police record and court documents show defendant was arrested very shortly after or within an hour or two after crime occurred. (T.Tr. 47, 48).

Assistant Prosecutor asked Mrs. Thompson about money that was taken from her, her answer. "Well, as near as I can remember, I believe it was about $350.00." To confuse jury assistant prosecutor imposed a question in a deceptive manner to make it appear she never saw the money until presented to her by police officers. Q. "Alright, were you later shown some money

69

by the Franklinton Police Department and asked to identify that if you could?"  A.  "Yes."  Q. "Were you able to identify part of the money as being yours?"  A.  "I was."  See T.Tr. 54-58; 72 - 78, 87, 156, 171.  The money Mrs. Thompson said was stolen from her went from nearly $4.00 to $383, to $350.00 finally to $286.00.  Relator's counsel was ineffective in that he had several options he could have taken to keep his client from being convicted wrongly by filing motion to suppress money that it had no probative value other than being prejudicial in the case.

Relator contends counsel erred in failing to file motion to suppress evidence of defendant's underwear and not objecting to State entering underwear as evidence.

Relator asserts affidavit supporting search warrant is invalid in that it gave not description of the assailant's height, weight, complexion, clothing or name, facial hair.  Victim's own testimony in affidavit and trial is tantamount that she never saw the perpetrator face clear enough to give a positive identification.  See Exhibit E4-A thru E4-D and T.Tr. 55.

Further, Relato asserts there was no search warrant therefore, there was no probable cause to arrest and seize any evidence from him.  In fact making any evidence seized illegal and any conviction obtained by said evidence is reversible.  Relator contends that his underwear was seized in violation of his Fourth Amendment right, should have been excluded at trial in state court.  See *Kimmelman v. Morrison*, 477 U.S. 365, 106 S.Ct. 2574.

Relator contends though there was a antigen's presence on his underwear.  It was never proven that it came from the victim.  *State v. Fugler*, 721 So.2d 1, 1997-1836 (La.App. 1 Cir. 9/25/98).  States in pertinent part, to defeat presumption that affidavit supporting search warrant is invalid, defendant must prove by preponderance of evidence that affidavit contains intentional misrepresentation.  Per Chiasson, J. Pro Tempore, with two judges concurring and assigning reasons.  U.S.C.A. Const. Amend. 4; LSA-Const. Art. 1 § 5; LSA-C.Cr.P. art. 162; *Fugler*, supra.

70

Relator contends there was no searches and seizures warrant and therefore any evidence seized and used as evidence in a course of law was illegally obtained, [emphasis added] and therefore inadmissible.

It is evident that trial counsel made no attempt to suppress evidence used at trial, money which had no probative value and underwear which was illegally seized that help State to convict relator. Had trial counsel sought suppression of said evidence he would have succeeded and would have been successive in preventing his client from being wrongfully convicted.

Relator contends that trial counsel fail to raise objection and to file motion to suppress in court identification.

Relator assert that in court indentification was insufficient to implicate him as perpetrator of crime against Mrs. Thompson, especially when there's little more than a general description of the assailant in the victim's affidavit to police officers. ". . . so the boy I'm thinking of, you know where he lives, up on the corner there in the same block with me." Exhibit E4-A. "I know he had on dark pants, I don't think I could describe them to you." Exhibit E4-B. Question by Armand: Could you give us a general description of him? Thompson: I don't know, I don't think he's as tall as you are. And heavier seemingly. Exhibit E4-C. Thompson: "Bushy headed." Bickham: What about his complexion? Thompson: "I think he was . . . I only saw him as he was walking in by the light, you see." Armand: thin-muscular built? Thompson: a big stout fellow. Exhibit E4-D.

Although, Mrs. Thompson in her in-court identification pointed to Relator as her attacker in front of court and the only black man sitting at the counsel's table. Relator contends this was suggestive identification and it also led jurors to believe it was proper identification when there was no lineup identification nor a photo I.D. to support the victim in court I.D. Even without police affidavit trial counsel had opportunity to impeach Mrs. Thompson testimony that she clearly

71

saw relator as the perpetrator of the crime against her. (T.Tr. 51). See (T.Tr. 55) and again (T.Tr. 60) under cross examination by Mr. Ford. Trial counsel had good reason to question the identity of his client as the victim's attacker from her very own statement, however, counsel did not. Therefore, leading to the conviction of his client. In closing argument trial counsel state, "I don't think this man has even been I.D.'d. (T.Tr. 169). Trial counsel should have known whether his client was properly I.D.'d or not. Trial counsel did no kind of investigation to find out if his client was properly I.D.'d outside of court, nor did he seek expert testimony on fallibility of eyewitness testimony. See *Neil v. Bigger*, 409 U.S. 188, 93 S.Ct. 375; *State v. Rosette*, 653 So.2d 80. It must be noted in her testimony Mrs. Thompson states (T.Tr. 49) she has known the defendant all his life since he was a little boy yet she couldn't give the police description of the person who raped her. Exhibit E4-A thru E4-D.

Trial counsel erred when he failed to object to State tactics to secure sympathy for the victim through his repeated use of the term, "This old lady' throughout the trial or comparing the size of the victim relator throughout his closing arguments. See T.Tr. 45, 48-9, 151, 153-4, 171-3.

Trial counsel erred when he failed to object to prosecutor's bullying and remarks made outside scope of facts and evidence stated in trial: "She is living on a fixed income and it is very important to her." It was never an issue or statement brought up about Mrs. Thompson's income or livelihood. Prosecutor only used such a statement to prejudice the jury against defendant.

Mr. Knight on cross-examination. (T.Tr. 140) I see. Isn't it true that she's (Mrs. Thompson) been cooking for your family since your mother has been dead and trying to help you all out a little bit? This question to relator while on the witness stand is further effort by prosecutor to draw the jury from the facts and acquire sympathy for the victim even though no

facts or reference were ever made in the trial as to Mrs. Thompson cooking for relator's family and needless to say such was untrue.

Mr. Knight on cross-examination resulted to bullying defendant on witness stand although trial counsel expressed anxiety to prosecutor's actions and court's mild rebuttal damage had been done. (T.Tr. 143-4).

Trial counsel erred when he did not object to prosecutor's insinuation that his client should be harshly interrogated, intimidate or beaten into confessing to the crime of aggravated rape. "He doesn't want to tell you what he remembers about that night. He doesn't want to admit to you what happened that night, but if he is pressed, and we could press hard enough and make him tell the truth, then I believe the truth would be that he went to Mrs. Ethel Thompson's house and raped her that night. ." These remarks attributed to the conviction of relator and trial counsel did nothing to prevent it. These statements by prosecutor prejudiced the jury in they overshadowed the facts of the case or lack of facts in the State's case and efforts in prosecuting relator on charge of aggravated rape and contributed to his wrongful conviction.

Relator contends his trial counsels were fatally incompetent and ineffective in that it was like not being represented at all in violation of his Fourteenth and Sixth Amendment right to counsel and due process. See *Argersinger v. Hamlin*, 407 U.S. 25, 92 S.Ct. 2006 (1972).

Relator further contends trial counsel was not familiar with his client's case adequately enough to represent him in a court of law and violated due process clause. See *Ganby v. State of Alabama*, 569 F.2d 1318 (3/23/78).

Relator contends he was denied the right to test scientifically any tangible objects in State's possession to counter prosecutor's charge of aggravated rape. Although, first counsel to defense Reggie Simmons filed Motion of Discovery and to receive tangible evidence in order to test

independently of State's results.  Latter trial counsel Thomas Ford failed to follow up on such request to defend his client right to fair trial.  Because of trial attorney incompetence, relator was tried and found guilty of aggravated rape upon irrelevant and inadmissible evidence.

Relator contends that his conviction is also a result of trial attorney lack of investigating his client's alibi.  It was only due to relator's efforts that just one of his witness was present at trial.  Trial counsel did nothing to ascertain his alibi through Ms. Vicki Anders and Carolyn Jackson who did not appear in court.  Mrs. Thompson stated in the police affidavit that the rape occurred about 2:35 in the morning then she dialed the time at 4:21.  Relator contribute the large gap between time of rape and when Mrs. Thompson called police is due the fact Mrs. Thompson had taken a bath in between the time.  See Exhibit E4-B and Exhibit D2.

In her testimony, Ms. Vicki Anders stated it was 3:30 in the morning when she was dropped off after getting back into town.  See T.Tr. 147, 148.

During Relator's testimony, he stated it was about 3:00 in the morning when they got back in town although unsure of it.  Relator stated he had went by Ms. Carolyn Jackson's house before going home.  Relator contends trial attorney did no investigation whatsoever to collaborate their client's alibi where Ms. Carolyn Jackson, Emily McKay, Fred Cain and Emmett Brown were necessary witnesses to prove relator was in another place during the commission of the crime.  See T.Tr. 132-3, 142, 148.

Mr. Thomas Ford failed crucially and fatally as defense counsel as has been shown by his incompetency and unprofessional errors to investigate the full facts he was entrusted to represent and to follow the groundwork which was laid before he entered the case.

Relator contends trial counsel erred in failing to object to court's erroneous instruction to the jury of the law which applies to aggravated rape which ultimately led to the conviction of his client. See *State v. Donahue*, 408 So.2d 1262; *State v. Gibbs*, 355 So.2d 1299 (La. 1978).

This case presents again the question of whether the harmless error standard of *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), applies to a jury instruction that violate the Fourteenth Amendment and the principle of *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) because it fails to clearly and effectively inform each reasonable juror that the State must prove every element of the criminal offense with which the defendant is charged beyond a reasonable doubt. The United States Supreme Court has not resolved this question ina square holding, but it has given clear signals that such an error cannot be harmless. See Discussion in *State v. Cage*, 583 So.2d 1125 (La. 1991).

Relator contends trial counsel erred in failing to file any motion at end of trial in behalf of his client. For instant, Mr. Ford knew his client was never indicted by a grand jury therefore he had the option of filing a motion to correct illegal sentence at end of trial, post verdict acquittal because of lack of credible evidence. Because of the numerous errors in trial, Mr. Ford could have taken advantage of any one of the cited statutes or articles. R.S. 15:438; R.S. 15:452; R.S. 14:42(1)(2); C.Cr.P. art. 382-3, art. 438, art. 442-4, art. 461-6, art. 770-5, art. 821-2, art. 811, art. 813-4, art. 778, art. 851(1)(2), and art. 853, art. 872, art. 881.5, art. 882(A)(B); C.E. art. 104-5, art. 401-2, art. 404, art. 801.

With all these options at his disposal, Mr. Ford filed no motions thereby abandoning his client, and therefore contributing to his guilty verdict and sentencing to life imprisonment. Relator contends there were no assignment of errors made on his behalf on Direct Appeal by S. Austin McElroy and David J. Knight, public defenders, because attorneys did not want to expose

75

long been settled that "the right to counsel is the right to the effective assistance of counsel", whether during trial or appeal. *McMann v. Richardson*, 397 U.S. 759, 771, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970); *Kimmelman*, supra.

When a defendant raises an ineffective assistance of counsel claim, he must show that "counsel's representation fell below an objective standard of reasonableness." *Strickland v. Washington*, 446 U.S. 668 (1984) and that there exists a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. *Strickland*, supra. The Louisiana Supreme Court interprets *Strickland* as requiring a showing that counsel's performance was deficient (not within the range of competence required of attorneys in criminal cases) and that deficient performance ended in the result that was unreliable. "The inquiry is whether, but for counsel's unprofessional errors, there is a reasonable probability the outcome of the trial would have been different." *State v. Sullivan*, 596 So.2d 177, 183 (La. 1992).

Relator has carried his burden of proving ineffective assistance of counsel. He has alleged in claim of this writ application that he was denied Equal Protection and Due Process of the Law due to "Ineffective Assistance of Counsel", in the Parish of Washington, State of Louisiana.

Relator contends that counsel knew there was no grand jury indictment which was required by law for the prosecution of R.S. 14:42 and if trial counsel did not have knowledge of prior Motion to Quash bill of information he should have filed motion to quash instead.

Relator contends that trial counsel failed to investigate into the facts of the case thereby fatally prejudiced his client in which sentence and conviction stands.

Relator further contends that trial judge is at fault that he had opportunity to alleviate the problem but did nothing.

Relator contends that appellate counsels did not investigate case and filed no assignment of errors when there's numerous nonfrivolous errors in instant case.   Thereby, denying him effective assistance of counsel and violating this Sixth and Fourteenth Amendment, and which prejudice your Relator on direct appeal.

## CONCLUSION

The facts in this case undisputably demonstrates that trial judge, Assistant District Attorney, Trial Counsel and Appellate counsel erratically and blatantly disregarded Relator's right to "Equal Protection" and "Due Process of Law" as an "American" citizen and of the State of Louisiana.

Relator has demonstrated through law code and articles that he did not have a fair trial and has been incarcerated for over two decades unlawfully being denied "Relief".

WHEREFORE, Relator pray that this Honorable Court grant this Application for Writ of Habeas Corpus, by ordering relator released from further confinement, or in the alternative, hold an evidentiary hearing so that the record can demonstrate the State's inability to prove each and every element of said charge.

Respectfully Submitted by:

David Lee Williams, #098840   12-12-07
Magnolia Unit-4
Louisiana State Penitentiary
Angola, La. 70712

81

## CERTIFICATE OF SERVICE

I, David Lee Williams, do hereby certify that a true copy of the foregoing Application for Habeas Corpus Relief has been served upon Ms. Loretta G. Whyte, Clerk of Court for the U.S. District Court for the Eastern District of Louisiana at 500 Camp Street, New Orleans, La. 70130; and Mr. Walter P. Reed, District Attorney for the 22nd Judicial District Court at 428 E. Boston Street, Covington, La. 70433. Done on this _12_ day of ~~November~~ December, 2007; by delivering it officially over to the Classification Department at the Louisiana State Penitentiary.

David L. Williams

DAVID LEE WILLIAMS

Docket No. _____

IN THE
SUPREME COURT
STATE OF LOUISIANA

EXHIBITS:

P.O. Box 607 • Franklinton, LA 70438        Franklinton (985) 839-4663 • Bogalusa (985) 732-7189

JULY 25, 2005

DAVID LEE WILLIAMS #98840
CAMP J GAR 1-L-6
LA STATE PRISON
ANGOLA, LOUISIANA 70712

RE: GRAND JURY REPORT

MR WILLIAMS,

I HAVE SEARCHED THROUGH YOUR RECORD AND WHAT WAS FILED ON
JANUARY 7, 1982 WAS A BILL OF INFORMATION NOT A BILL OF INDICTMENT.
THEREFORE, THERE WILL BE NO GRAND JURY REPORT FOR YOUR CASE.

AS TO THE MOTION TO QUASH YOU HAVE REQUESTED A COPY IS ENCLOSED.


SINCERELY

*Tanda Polk*
TANDA POLK
DEPUTY CLERK

A PROVEN ADMINISTRATOR - A GOOD LISTENER

M. Reggie Simmons                                    JUDGE
Attorney for Defendant
913 Washington Street
Franklinton, Louisiana  70438


SHERIFF:  Please serve the office of the District
          Attorney at the Washington Parish Court-
          house in Franklinton, Louisiana.

*Reggie Simmons*
ATTORNEY AT LAW
CLINTON, LA. 70438

A True Copy of Original
This 7-25-05
*Tanda Polk*
Dy. Clerk of Court

ST. TAMMANY PARISH
DISTRICT ATTORNEY'S OFFICE
428 E. BOSTON STREET
COVINGTON, LA 70433
898-2392 OR 646-4083

NON-SUPPORT DIVISION
401 NORTH NEW HAMPSHIRE STREET
COVINGTON, LA 70433
892-3727 OR 649-0715

SLIDELL OFFICE
520 OLD SPANISH TRAIL
SUITE 340
SLIDELL, LA 70458
646-4110



**WALTER P. REED**
DISTRICT ATTORNEY
WASHINGTON PARISH · ST. TAMMANY PARISH
22ND JUDICIAL DISTRICT

WASHINGTON PARISH DA'S OFFICE
905 PEARL STREET
FRANKLINTON, LA 70438
839-6711 OR 735-0380

NON-SUPPORT DIVISION
905-B PEARL STREET
FRANKLINTON, LA 70438
839-6303

BOGALUSA OFFICE
328 AUSTIN STREET
BOGALUSA, LA 70427
732-9594

July 8, 2002

Mr. David L. Williams
Ash 1
Louisiana State Prison
Angola, La. 70712

Re:     State of Louisiana
        Vs- #82-CRC-37096. 22ᵈᵈ Judicial District Court, Washington Parish, La.
        David Lee Williams

Dear Mr. Williams:

Enclosed please find copies of the documents contained in the District Attorney's file of the above matter.

Cordially,

DALE E. BRANCH
Assistant District Attorney

DEB/js
Enc.



**Mr. David Lee Williams**
#98840, Magnolia Unit-1
Louisiana State Penitentiary
Angola, Louisiana 70712

January 27, 1999

Hon. Johnny D. Crain
Clerk of Court
22nd Judicial District Court
Courthouse, Washington & Main Street
P.O. Box 607
Franklinton, La. 70438

Re: Copy of Indictment in
case no. 36,096.

Dear Hon. Crain:

   Hello.   I am writing in request that I be provided with a copy of the original indictment in my particular case.   The docket number to my case is #36,096.   I would like to know the cost for a copy of this document.

   Your time and consideration in review of my request will be greatly appreciated.   I look forward towards hearing from you at a time most convenient for you.   Thanking you in advance.

Sincerely,

**DAVID LEE WILLIAMS**

CC: file
     L.A.O./pdg.

*Exhibit "A" 2)*